IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIMOTHY G. NEWSOM     :
     Plaintiff,         :
                         :
v.                      :     CIVIL ACTION NO.
                         :     1:08-CV-2600-RWS-SSC
CITY OF MARIETTA,     :
     Defendant.       :

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This matter is before the court on the Motion for Summary Judgment [Doc. 37] filed by Defendant City of Marietta.   For the reasons that follow, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment [Doc. 37] be **GRANTED** and that the claims of Plaintiff Timothy G. Newsom ("Plaintiff") be dismissed.

## I.   Procedural History

Plaintiff is a man who was terminated from his employment with the City of Marietta ("Defendant" or "the City") effective February 29, 2008.  On August 18, 2008, Plaintiff filed a complaint [Doc. 1] alleging that Defendant discriminated against him because of his sex (Count I) and retaliated against him (Count II) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[1]  Defendant filed its Answer [Doc. 3] on September 8,

---

[1] In his response in opposition to Defendant's motion for summary judgment, Plaintiff states that he "is pursuing only his . . . claim of termination in retaliation for objecting to Diedrich's allegedly discriminatory employment practices" and he does not oppose "Defendant's motion as to sex discrimination." (Pl. Resp., Doc. 60 at 2).  Therefore, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's claim of sex discrimination

2008, and discovery proceeded.

Defendant has now filed a motion for summary judgment, with supporting memorandum, statement of undisputed material facts and exhibits.  [Doc. 37]. Plaintiff filed a response in opposition to Defendant's motion [Doc. 60], a response to Defendant's statement of undisputed material facts [Doc. 58] and a statement of disputed material facts [Doc. 59].  Defendant filed a reply in support of its motion [Doc. 70] and a response to Plaintiff's statement of disputed material facts [Doc. 68].  Plaintiff also filed a surreply [Doc. 75].[2]  Meanwhile, Defendant filed a motion for leave to file notice of new and supplemental authority [Doc. 73], which the court granted [Doc. 76], and a supplemental reply brief [Doc. 79].  Plaintiff filed a response to the notice of new and supplemental authority. [Doc. 80].

## II.  Facts

### A.  Standards for Determining Facts for Summary Judgment

The "facts," for summary judgment purposes only, are derived from the submissions of the parties, as set out in Defendant's Statement of Material Facts as to Which There is No Genuine Issue to be Tried (hereinafter referred to as "Def. SMF") [Doc. 37][3]; Plaintiff's Statement of Material Facts Which Present a Genuine

_____

(Count I).

[2] The court granted Plaintiff leave to file a surreply.  [Doc. 74].

[3] The undersigned notes that many of Defendant's statements of material fact fail to comply with LR 56.1(B), NDGa., which requires that "[e]ach material fact must be numbered separately and supported by a citation to evidence proving such fact."  This failure has made more difficult the court's task of determining whether there are genuine issues of material fact in dispute. Defendant is reminded of the obligation of litigants in this court to comply with the Local Rules.

Issue for Trial [Doc. 59] (hereinafter referred to as "Pl. SMF"); Plaintiff's response to Defendant's statement of material facts [Doc. 58]; Defendant's response to Plaintiff's statement of disputed material facts [Doc. 68]; and uncontroverted record evidence.  The court has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried.  However, the court is not obligated to "scour the record" to determine whether triable issues of fact exist.  Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004).  The facts are construed in the light most favorable to Plaintiff as the non-movant.  See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001).

## B.   **The Facts Relevant to Defendant's Motion for Summary Judgment**[4]

### 1.   **Plaintiff's Employment with the City of Marietta**

Defendant is a municipal corporation located in Cobb County, Georgia. (Def. SMF ¶ 1).  Defendant hired Plaintiff in March 1994 as the Employment and Compensation Manager.  (Newsom Dep. at 32; see also Def. SMF ¶ 1).  In July 2001, Plaintiff's position was "split," and Plaintiff became the Compensation and Classification Manager ("Comp & Class Manager") in the Personnel and Risk Management Department ("Personnel Department").  (Newsom Dep. at 34; Def. SMF ¶ 1).  Miriam Corbin became the Employment Manager.  (Newsom Dep. at 42).

---

[4] Certain other facts relevant to the undersigned's consideration of Defendant's motion are discussed in the body of this Report.

As Comp & Class Manager, Plaintiff reported to the Personnel Director. (Def. SMF ¶ 1). His duties consisted of evaluating compensation levels for the job positions within the City, including surveying other local government employers in Georgia and recommending adjustments to bring pay rates within a competitive market level, and providing reports on labor costs upon request and during the annual budget process. (Def. SMF ¶ 2; see also Ex. 1 to Guy Decl., Doc. 45). Plaintiff also conducted job audits (which involved creating and evaluating job descriptions and qualifications for positions, either before they were opened or when a department manager requested a review) and made recommendations to the Personnel Director. (Newsom Dep. at 108-9; Def. SMF ¶¶ 3, 22). Under the "formal process" for job audits that was used when "major changes [were] made," the Personnel Director made the final decision on what job descriptions were adopted, but if Plaintiff or the director of the relevant department disagreed with the Personnel Director, the job description would be discussed with the City Manager. (Newsom Dep. at 109-10). Plaintiff also "created" and served as the webmaster of the Local Government Salary Exchange ("LGSE") Web site, which contained a searchable database of over 200 job titles and salary information from approximately thirty local government employers throughout Georgia. (Newsom Dep. at 96-97; Def. SMF ¶ 4; Pl. Resp. to Def. SMF ¶ 4). He used the LGSE Web site to conduct surveys of duties and salaries for positions. (Def. SMF ¶ 4; Pl. Resp. to Def. SMF ¶ 4). He estimated that 40 to 50 percent of his job was devoted to LGSE management and comprehensive surveying. (Newsom Dep. at 100-01).

Plaintiff had no responsibilities relating to the screening of job applicants.  (Def. SMF ¶ 18).

In July of 2007, Fran Diedrich replaced Nancy Martin as Personnel Director for the City.  (Def. SMF ¶ 7).  Diedrich reported to the City Manager, Bill Bruton, who was responsible for managing the day-to-day affairs of the City and reported directly to the Mayor and City Council.  (Def. SMF ¶ 7).

Meanwhile, Plaintiff took an extended medical leave of absence from July 2007 through September 24, 2007.  (Def. SMF ¶ 8).  While Plaintiff was on leave, Bruton and Diedrich discussed problems the City was having filling certain executive positions and decided to engage an outside consultant to perform a limited compensation and classification study.  (Def. SMF ¶ 8).  The contract for this study was awarded to HRMP, Inc.  (Def. SMF ¶ 8).  Plaintiff did not participate in the decision to retain HRMP or in the study it conducted.  (Def. SMF ¶ 9; Pl. Resp. to Def. SMF ¶ 9).

### 2.   **Reclassification of Positions filled by Williams and Hammock**

According to Plaintiff, at the first staff meeting after Plaintiff returned to work in October 2007, Diedrich stated her intention to reclassify and upgrade two positions in the Personnel Department, which were filled by female employees Sammie Williams and Libby Hammock, "before any formal request was made by the employee and before we were even accepting reclassification requests." (Newsom Dep at 111-12, 136).  Plaintiff testified,  "I was excluded from the required paperwork that was supposed to be sent through my office.  There was

no formal application through, to me from those employees or requests, . . . to . . . conduct a job audit. . . . I did not conduct a job audit on those two employees." (Newsom Dep. at 118).

Plaintiff questioned Diedrich about her statements concerning Williams and Hammock.  (Newsom Dep. at 248).  He explained that when Diedrich said, "there had been previous discrimination in the department," Plaintiff asked her what she meant and why she was "bringing up such an outlandish statement about previous discrimination." (Id.).  He "complained [to Diedrich] that she was making a decision before the process even started." (Newsom Dep. at 250).  Plaintiff told Diedrich that "[h]er processing actions are discriminatory; these processes [i.e., the existing classification system] are not and they're not directed at any one gender or race." (Id. at 251; see also Diedrich Aff., Doc. 46, ¶ 21).

During the 2008 budgeting process, after Plaintiff's termination, Diedrich reclassified the positions filled by Williams and Hammock because in her opinion, "the levels of work they performed were not reflected in their job descriptions or by their levels of compensation that were in place when [she] first arrived in July 2007." (Diedrich Aff., Doc. 46, ¶ 20; Def. SMF ¶ 13).

### 3.   Modarski's Transfer

Sometime in October or November 2007, Payroll Manager Nicole Curl approached Plaintiff and asked him whether Thomas Modarski, a male police officer transferring from the Police Department to the Fire Department, could be paid "above the current certification" pay level that had been developed by

Plaintiff.  (Newsom Dep. at 139-40; <u>see generally</u> <u>id.</u> at 139-42, 197-203).  The

transfer at the higher rate had already occurred, but according to Plaintiff was

"incorrect" because the officer did not have paramedic certification.  (<u>Id.</u> at 140).

Plaintiff asked Corbin why he was not included in the conversation about the pay

rate, and Corbin responded "that this could be done because [Diedrich] said so."

(<u>Id.</u> at 140-41).  Later that day, Diedrich explained to Plaintiff that "there was a

lateral transfer policy that this [action] could . . . transpire." (<u>Id.</u> 141-42).  Plaintiff

questioned Diedrich's interpretation of the lateral transfer policy with respect to

the rate of pay that was applied, and he questioned why he was not included in

the discussion about the established pay program.  (<u>Id.</u>). Plaintiff recounted his

conversation with Diedrich:

> I tried to question her on her logic on that, and she told me that this
> gentleman had worked for the City and he knew the geography of the
> area.  And [I said], "Well, Fran, that doesn't have anything to do with
> it."   It did not -- this transfer, you would have to have the
> qualifications to enter at those pay levels.
>
> I wasn't objecting to the transfer itself.  I was objecting to the fact
> that the employee was being paid at, above employees that had
> certifications, and it was unequal treatment to them that were
> working in the program.
>
> . . . .
>
> [At a staff meeting] I again tried to appeal to Fran's logic on this in
> that it would be the same thing if transferring any employee, the
> employee would have to qualify for the job first. . . . [A]ny job you're
> transferred to, you have to meet those qualifications.  If you don't
> meet those qualifications and you're given that opportunity and
> competitive, whether it's internal, external recruitment, if you don't
> meet the higher qualifications you would come in at entry level and
> start through the program like everyone else.

(Id. at 201-02).  Plaintiff did not talk to Bruton or the fire chief about Modarski's transfer.  (Id. at 203).  Plaintiff did not complain to anyone that anything to do with Officer Modarski's transfer was based on discrimination, nor was Plaintiff aware of any complaints of discrimination made by Modarski in conjunction with his transfer (id. at 143), nor has he pointed to evidence that any other employee complained of discrimination concerning the transfer.

### 4.    **Donna Fritz's Promotion**

Judy Garrett, the City's Code Enforcement Manager, informed Diedrich that she wanted to revise the job description for the Code Enforcement Inspector position prior to the vacancy being advertised and that the job description and standards written by Plaintiff were unacceptable.  (Diedrich Aff., Doc. 46, ¶ 23). Diedrich informed Plaintiff that she was changing the job description as Garrett requested, and the vacancy was posted internally.  (Id. ¶¶ 26-27).  Corbin, who reviewed all applicants for vacant City positions, informed Diedrich that no applicant for the Code Enforcement Inspector position met all the requirements listed in the City's job description and noted that, of all the applicants, Donna Fritz came closest but did not have five years of experience in Code Enforcement. (Def. SMF ¶¶ 18, 19).  Diedrich allowed Fritz to be considered for the position, and Garrett hired her.  (Id. ¶ 20).

Plaintiff disagreed with the decision to promote Fritz to the position because she did not have five years of experience in Code Enforcement, and he therefore

did not believe she met all the requirements listed in the job description.  (Id. ¶

24).  Plaintiff met with Diedrich to discuss the reclassification, and he described

the beginning of that meeting as follows:

> As soon as I walked in there she threatened my job and said, "You've
> got to get on track."  And I said, "What do you mean by that?"  She
> says, "Well, you need to get on track or else."
>
> And I understood that very clearly to be she was going to get rid of me
> if I didn't go along with her agenda[5] on this.

(Newsom Dep. at 206).  Plaintiff recounted the conversation he then had with

Diedrich about Fritz's promotion:

> When I talked to [Diedrich] about this, she again brought up what
> she had in the past about, "Well, these job standards are
> discriminatory against women and minorities."  And I told her no,
> they were not discriminatory against women and minorities.
> Everyone has the same qualifications -- as I listed in the e-mail, . . .
> everyone, no matter what race or gender, would have to qualify under
> those standards.  I went in and - -
>
> [s]he says, "No, . . . it would disallow this female candidate, and why
> not take a chance on her?"
>
> I told her, "It has nothing to do with chance.  Either you qualify for
> the standard or you don't."

(Newsom Dep. at 207; see id. at 222-23).  Plaintiff told Diedrich that the "job

---

[5] In his deposition, Plaintiff made numerous references to what he perceived to be
Diedrich's "agenda," i.e., "[Diedrich's] agenda in hiring female applicants"; "promoting women and
minorities was [Diedrich's] agenda all along"; "that was her agenda, women and minorities"; "her
agenda was to promote women and minorities"; "Her agenda being discrimination, and against
male employees, and her agenda to promote female employees."  (Newsom Dep. at 95, 177, 208,
250, 280).  As discussed in the body of this Report, infra, having an agenda is not, without more,
equivalent to committing an unlawful employment practice and cannot reasonably be viewed as
such.

specifications are not gender specific in any way and [are] not discriminatory." (Id. at 224).   According to Plaintiff, by saying these job standards are not discriminatory, he was objecting to discrimination in the workplace.  (Id.).

In his deposition, Plaintiff explained that his objection to the Fritz promotion was "[Diedrich's] intention to promote a female employee that did not have the qualifications as specified in the job description."  (Newsom Dep. at 219).  He recounted the manner in which he made his objection:

> I made the objection in a series of e-mails.  Initially I had laid out the reasons why the position was classified where it was classified . . . . . . .
>
> [Diedrich] had said that the job description seriously was flawed, again to the code manager.  And what I had sent to her was the comparison of that particular job with the other similar inspectors that were in that classification. I laid out very clearly that that position, and compared with other inspectors, was evaluated, as far as the specifications go, equal, within the range of the job or the pay grade, and laid that out very clearly.
>
> . . . I asked [Diedrich] why were we not opening the position externally.  In her e-mail she said she has a known applicant that works well in a pinch and why not take a chance.
>
> . . . She said something about career ladders, there was no career ladders for that job. In my final e-mail, of course, there was a career ladder for the position, the code enforcement specialist that was created a year and a-half prior to that time.
>
> And I asked again why were we not opening the position up externally, because she was criticizing the pay on the position and the fact that she was assuming that no one would apply for the position, and I responded directly to that.

(Id. at 219-21).

### 5.   Other Objections Made by Plaintiff

When Diedrich made a statement that the City's job standards were discriminatory against women and minorities, Plaintiff told her that the job standards "do not specifically prefer any gender" and that "if we need to recruit women and minorities in areas that are predominantly male, we need to specifically advertise and target those specific areas." (Newsom Dep. at 189).

Plaintiff told Diedrich that the "step program" she proposed "would be against equal pay to pay someone more money because, say for instance, someone is paid less money, and someone is making $0.50 more, and you create a step program and you're basically giving money to the lower-paid individual for no reason at all, and you're penalizing this employee for previous awards that employee had made through merit pay." (Id. at 180).

Plaintiff also "objected" to Diedrich's use of "gender specific terms," including: calling the water and sewer, electrical and sanitation supervisors "baby-sitters" and using the phrase "good old boy system." (Newsom Dep. at 165-66).

### 6.   **Reorganization of the Personnel Department and Plaintiff's Termination**

Diedrich reviewed the operations of the Personnel and Risk Management Department between July 2007 and January 30, 2008 to determine whether the Department was operating effectively and efficiently. (Diedrich Aff., Doc. 46, ¶¶ 4, 8). As she evaluated the workload of the employees in the Department, she began to consider whether the managers in the Department would benefit from a human resources generalist who could provide support to them for substantive matters

for which the existing administrative support staff was not qualified.  (Def. SMF ¶ 31).  Diedrich also concluded that the duties of the Comp & Class Manager's position did not require a full-time position.  (See Def. SMF ¶ 26 and Pl. Resp. to Def. SMF ¶ 26; see also Pl. Resp. to Def. SMF ¶ 30).

On February 11, 2008, Diedrich recommended to Bruton that the Department be reorganized by eliminating the Comp & Class Manager position and adding a lower-level Human Resources Analyst ("HRA") position.  (Def. SMF ¶¶ 32, 33).  Bruton and Diedrich discussed Diedrich's proposal, and Bruton approved the reorganization.  (Def. SMF ¶ 33).

On February 15, 2008, Diedrich informed Plaintiff that the Comp & Class Manager position would be eliminated effective February 29, 2008.  (Diedrich Aff., Doc. 46, ¶ 35 & Ex. C).  Diedrich's February 15th memorandum addressed to Plaintiff states in part:

> In accordance with the City of Marietta Code of ordinance; this is to advise that your employment with the City of Marietta Personnel and Risk Management Department will be terminated effective February 29, 2008, because the department will be reorganized eliminating the Compensation and Classification Division. . . . You will be paid your regular salary and receive benefits through February 29, 2008.  Your last day of work will be Friday, February 15, 2008.  You should not report for work after that date.
>
> This separation from employment reflects no dissatisfaction with your performance.  Termination is based on management rights and responsibilities pursuant to section 4-4-2-040 of the City/BLW's Personnel Rules and Regulations and as such is not eligible for grievance under the City's grievance procedure.  The termination is considered involuntary and you are eligible to seek employment with the City/BLW for other vacant positions so long as you meet the minimum qualifications required for that position.

(Ex. C to Diedrich Aff., Doc. 46).  Plaintiff did not apply for the HRA position.  (Def. SMF ¶ 43).

On March 12, 2008, the United States Equal Employment Opportunity Commission ("EEOC") received Plaintiff's Charge of Discrimination alleging that he had been discriminated against on the basis of his sex and retaliated against. (Ex. G to Diedrich Aff., Doc. 46).  The EEOC issued a Notice of Right to Sue on July 31, 2008 (Ex. 1 to Guy Decl., Doc. 45, at 21[6]), and Plaintiff filed this action on August 13, 2008 [Doc. 1].

## IV.  **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, he must respond by going beyond the pleadings, and by his own

---

[6] The page citation is to the pagination assigned by the court's electronic filing system (CM/ECF).

affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  See id. at 322, 324.  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).  It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter. Id. at 249.  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The Eleventh Circuit has explained summary judgment as follows:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Young v. General Foods Corp., 840 F.2d 825, 828 (11th Cir. 1988) (quoting Celotex Corp., 477 U.S. at 322-23), cert. denied, 488 U.S. 1004 (1989).  Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which

14

would be inadmissible at trial." <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir. 1991)(citation omitted), <u>cert. denied</u>, 506 U.S. 952 (1992).  The evidence "cannot consist of conclusory allegations or legal conclusions."  <u>Id.</u> (citation omitted). Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  <u>See</u> <u>Midwestern Waffles, Inc. v. Waffle House, Inc.</u>, 734 F.2d 705, 714 (11th Cir. 1984).

## V.  <u>Discussion</u>

Plaintiff's sole remaining claim is his retaliation claim. (<u>See</u> <u>supra</u> note 1). In his complaint, Plaintiff alleges that "Defendant through Ms. Diedrich" terminated him "[w]hen [he] refused to comply with Ms. Diedrich's requests to circumvent and/or disregard equal opportunity rules" and that "[s]uch retaliatory action is in violation of Title VII."  (Doc. 1, Compl. ¶¶ 43-44).

## A.  <u>Analytical Framework for Retaliation Claims</u>

Under 42 U.S.C. § 2000e-3(a), it is "an unlawful employment practice for an employer to discriminate against any . . . employee[ ] . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  The participation clause of the statute "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC . . . ." <u>EEOC v. Total Sys. Servs., Inc.</u>, 221 F.3d 1171, 1174 (11th Cir.

2000); <u>see also</u> <u>Booker v. Brown & Williamson Tobacco Co.</u>, 879 F.2d 1304, 1313 (6th Cir. 1989) (instigation of statutory proceedings is prerequisite to protection under participation clause).  Plaintiff does not allege unlawful retaliation under the participation clause.  The opposition clause, upon which Plaintiff's claim is based, protects activity that  occurs prior to the filing of a formal charge with the EEOC, such as submitting an internal complaint of discrimination to the employer or informally complaining of discrimination to one's supervisors.  <u>See</u> <u>Rollins v. Fla. Dep't of Law Enforcement</u>, 868 F.2d 397, 400 (11th Cir. 1989) ("[T]he protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like Rollins, who informally voice complaints to their superiors or who use their employers' internal grievance procedures."); <u>see also</u> <u>Holifield v. Reno</u>, 115 F.3d 1555, 1566 (11th Cir. 1997).

To establish a *prima facie* case of retaliation under Title VII, in the absence of direct evidence,[7] the plaintiff must show that "(1) [he] engaged in a statutorily protected activity; (2) the employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse action." <u>Berman v. Orkin Exterminating Co.</u>, 160 F.3d 697, 701 (11th Cir. 1998); <u>see also</u> <u>Meeks v. Computer Assocs. Int'l</u>, 15 F.3d 1013 (11th Cir.1994); <u>Donnellon v. Fruehauf Corp.</u>, 794 F.2d 598 (11th Cir. 1986). The third prong is satisfied by evidence that the protected action and the adverse

---

[7] Plaintiff has not argued that there is direct evidence of retaliation.

employment action are not totally unrelated.  <u>Berman</u>, 160 F.3d at 701; <u>Weaver</u>

<u>v. Casa Gallardo, Inc.</u>, 922 F.2d 1515, 1525 (11th Cir. 1991).[8]

## B.    **Plaintiff's Retaliation Claim**

### 1.    **The Parties' Contentions**

Defendant argues that Plaintiff cannot establish a *prima facie* case of

retaliatory termination because he cannot show that he engaged in statutorily

protected conduct.  (Doc. 37, Def. Br. at 22-28).  Defendant argues specifically

that Plaintiff "never put the City on notice that his activity was based on what he

perceived to be discriminatory employment practices" (<u>id.</u> at 24); that Plaintiff's

"misinformed reference to the Equal Pay Act does not qualify as protected

opposition" because it was not objectively reasonable (<u>id.</u> at 25-26); that Plaintiff's

"disagreement with Ms. Diedrich's opinion that certain of the City's established job

standards had a discriminatory impact on minority and female employees and

applicants . . . does not . . . translate into an objection by Plaintiff that Ms.

Diedrich's decision to depart from job standards she perceived to be

discriminatory was itself discriminatory" (<u>id.</u> at 26); and that Plaintiff did not

communicate "to Ms. Diedrich or any other City official that his objections [to

---

[8] Retaliation claims under Title VII are analyzed using the <u>McDonnell Douglas/Burdine</u> burden-shifting framework used to prove disparate treatment cases by circumstantial evidence. <u>See</u> <u>Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 511 n.10 (11th Cir. 2000). Thus, if the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory basis for the action.  <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the defendant does so, then in order to avoid summary judgment, the plaintiff must point to evidence from which reasonable jurors could conclude that the employer's proffered explanations are a pretext for retaliation.  <u>See</u> <u>id.</u>

Diedrich's decisions relating to job qualifications] were based on a belief that [those] decisions . . . were motivated by discriminatory animus" (id. at 27). Defendant does not appear to dispute that Plaintiff can make out the other elements of a *prima facie* case.[9]

In response, Plaintiff contends that he engaged in protected activity when "[e]ven if [he] did not use the word 'discrimination' in opposing Diedrich's allegedly discriminatory employment practices, he made it clear to Diedrich that he objected to her circumventing classification standards in order to fix the sex and race discrimination she perceived"; when he voiced his objection to Diedrich's decision to allow "a police officer . . . to transfer to the fire department without the requisite certification, but at his same pay rate which was above that of his coworkers"; when he disagreed with Diedrich's perception that existing job standards "adversely affected female and minority employees"; when he objected to Diedrich's "reclassification of the positions of Sammie Williams and Libby Hammock" and "questioned her as to what she meant by discrimination"; and when he "objected to Diedrich lowering the standards [for the Code Enforcement position] to accommodate a female and explained to her that the reason for the experience requirements was internal equity" and "told Diedrich this would be

---

[9] Defendant notes that "[a] retaliation plaintiff's failure to place his employer on notice that he believes the employment practice he is opposing to be discriminating is sometimes analyzed as the causation element of the *prima facie* case." (Doc. 37, Def. Br. at 28 n.12, citing cases). Defendant does not develop a causation argument. The undersigned finds that the issue here is properly analyzed under the protected conduct element of the *prima facie* case and accordingly analyzes it under that element.

discriminatory." (Doc. 60, Pl. Resp. at 5-7). Plaintiff asserts that he "regularly voiced objections to Diedrich's discriminatory employment practices[,] . . . regularly attempted to engage her on her assertions that discriminatory job standards existed" and "explained to her how the standards were not sex or race based and assured her that a particular practice was not discriminatory." (Id. at 7). Plaintiff acknowledges that "Diedrich is not alleged to have acted with discriminatory animus in the employment decisions she made concerning Marietta employees and their classifications" but contends that "she perceived an ongoing problem of discrimination and sought to remedy it with what can only be described as an ad hoc affirmative action plan, which has long been held unlawful under Title VII. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 499 (1989)." (Id. at n.3).

### 2.  **Analysis of Plaintiff's Claim**

Analysis of Plaintiff's claim begins with the opposition clause language of Title VII's anti-retaliation provision: it is "an unlawful employment practice for an employer to discriminate against any . . . employee[ ] . . . because he has *opposed any practice made an unlawful employment practice* by *this subchapter*." 42 U.S.C. § 2000e-3(a) (emphasis added). In Crawford v. Metro. Gov't of Nashville, 129 S. Ct. 846, 849-51 (2009), the Supreme Court addressed the meaning of "oppose" in the context of Title VII's anti-retaliation opposition clause and held that the petitioner's statement, "an ostensibly disapproving account of sexually obnoxious behavior toward her by a fellow employee" that was made in response to

19

questioning during an internal investigation into allegations of sexual harassment against that employee, was protected opposition under Title VII's anti-retaliation provision.  The Court thus held that the opposition clause's protection "extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation."  Id. at 849.

Plaintiff argues that Crawford's broad definition of "oppose" supports his retaliation claim (Doc. 60, Pl. Resp. at 5), but the critical question in this case is what did he oppose?  For Plaintiff's opposition to warrant protection under Title VII, his opposition must be to a "practice made an unlawful employment practice" by Title VII.  The definition of such practices on the part of employers is found in 42 U.S.C. § 2000e-2:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The defect in Plaintiff's Title VII retaliation claim is that while he may have voiced his disagreement with and objection to Diedrich's assessment of the state of equal

employment opportunity in the City, he has failed to identify an unlawful employment practice that he opposed.

"To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to [his] protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed." Holifield, 115 F.3d at 1566 (quoting Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989)); see also Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999)("[A]n employee who seeks protection under the opposition clause must have a 'good faith, reasonable belief' that her employer has engaged in unlawful discrimination." (citation omitted)); Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) ("[A] plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.").

A plaintiff's burden under this standard has both a subjective and an objective component. Little, 103 F.3d at 960. "A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." Id. (emphasis in original); see also Clover, 176 F.3d at 1351. "The objective reasonableness of an employee's belief that [his or her] employer has engaged in an unlawful employment practice must

be measured against existing substantive law." <u>Id.</u>[10]

Plaintiff argues that even if he "did not use the word 'discrimination' in opposing Diedrich's allegedly discriminatory employment practices, he made it clear to Diedrich that he objected to her circumventing classification standards in order to fix the sex and race discrimination she perceived." (Doc. 60, Pl. Resp. at 5). He also argues that his belief that "the practices [he] opposed were close enough to discrimination to support a reasonable belief that it was," given that "Diedrich admitted that she believed Defendant's compensation and classification system discriminated against women and minorities and attempted to remedy it" and that he "objected to Diedrich bypassing the system in place in order to accommodate females." (<u>Id.</u> at 7-8). Plaintiff has not offered evidence that Diedrich "request[ed] that he circumvent and/or disregard equal opportunity rules." (<u>See</u> Doc. 1, Compl. ¶ 43).

While Plaintiff may have "made it clear to Diedrich that he objected to her circumventing classification standards in order to fix the sex and race discrimination she perceived," Plaintiff has failed to show that the actions he was

---

[10] Plaintiff alleges that he was opposing "Diedrich's discriminatory employment practices," which he contends were based on gender and race. (Doc. 60, Pl. Resp. at 5-8). Therefore, the objective reasonableness of his belief must be measured against the substantive law for race and gender discrimination claims. In order to establish a *prima facie* case of race or gender discrimination under Title VII, in the absence of direct evidence, a plaintiff must show that he or she was: (1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in the protected class. <u>Kelliher v. Veneman</u>, 313 F.3d 1270, 1275 (11th Cir. 2002); <u>Holifield</u>, 115 F.3d at 1562; <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1286 (11th Cir. 2000).

objecting to could reasonably be believed to violate Title VII.

### a.   Reclassification of Positions of Williams and Hammock

Plaintiff objected to Diedrich's "statement of her intentions to reclassify" the positions filled by two female employees, Williams and Hammock, so they would receive pay increases.  (Newsom Dep. at 249).[11]  Plaintiff questioned Diedrich's explanation that "there had been previous discrimination in the department," and he "complained that she was making a decision before the [City-wide reclassification] process even started."  (Newsom Dep. at 248, 250).  He told Diedrich, "This is discriminatory."  (Id. at 250).  When asked to specify what he said, Plaintiff responded:

> I questioned her as to what she meant by discrimination.  And, you know, . . . it became more and more apparent after her conversations, "There was discrimination at the City," and she went on about the job standards being discriminatory.
> . . . .
> My statements were . . .
> . . .
> [h]er processing actions are discriminatory; these processes are not and they're not directed at any one gender or race.

(Id. at 250-51).

The undersigned finds that while Plaintiff's statements to Diedrich could show that he subjectively believed she was engaged in unlawful discrimination, his opposition to her actions is not protected activity because Plaintiff's subjective

---

[11] The reclassification of these positions did not actually occur until after Plaintiff's termination.  (Def. SMF ¶ 13).

belief is not objectively reasonable.   Specifically, he has failed to identify any action that could reasonably be viewed as constituting an unlawful employment practice.

It is important to note that whether the then-existing employee compensation and classification system was or was not discriminatory toward women is not at issue in this lawsuit.   Plaintiff, who took part in creating the classification system, apparently believed that it was not; Diedrich apparently believed otherwise.   The action to which Plaintiff objected, however, was not the replacement of the existing system with one that favored women.   It was the reclassification of two women, within the existing system, so they would receive higher pay.   Even if that action was motivated by a desire on Diedrich's part to remedy the effects on these two women of past discrimination, Plaintiff has made no showing that the reclassification of Williams and Hammock resulted in, or could reasonably be believed to have resulted in, prohibited discrimination. Plaintiff has failed to identify any individual, including himself, who was or would be "discriminate[d] against" or who was or would be "adversely affect[ed]" by the reclassification of the positions of two women.   To the extent Plaintiff voiced an objection that Diedrich's action was discriminatory, his objection was, at most, to a hypothetical possibility that some other similarly situated individual who was not a female or was not otherwise in the same protected category under Title VII as Williams and Hammock might not receive a similar reclassification at some point in the future.   That is not enough to render reasonable Plaintiff's belief that

Diedrich's action amounted to an unlawful employment practice under Title VII.

Plaintiff's disagreement with Diedrich's intention to reclassify the positions of Williams and Hammock is much like the complaint in the plaintiff's letter alleged in <u>Booker</u> to constitute protected conduct under a state anti-retaliation law, which the court interpreted in light of Title VII's opposition clause.  <u>See</u> <u>Booker</u>, 879 F. 2d at 1309, 1311-12,1313.  There, the plaintiff alleged in a letter, in part, that the charges leading to his demotion were the result of "ethnocism," which the court construed to mean "discrimination."  Explaining its decision that the letter did not fall under the opposition clause of the statute, the court wrote:

> An examination of the letter indicates that it is not in opposition to a violation of the Act.  Booker was not contesting any unlawful employment practice; he was contesting the **correctness** of a decision made by his employer. . . .
>
> . . .
>
> [W]e hold that a vague charge of discrimination . . . is insufficient to constitute opposition to an unlawful employment practice.  An employee may not invoke the protections of the Act by making a vague charge of discrimination.  Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination.  In our view, such would constitute an intolerable intrusion into the workplace.

<u>Id.</u> at 1313 (emphasis added).

Viewing Plaintiff's testimony in the most favorable light, the undersigned concludes that when Plaintiff complained to Diedrich about her intention to reclassify the positions of Williams and Hammock, he was "contesting the

correctness of a decision made by his employer." Booker, 879 F.2d at 1313.  At best, his objections included a vague charge of discrimination, but it was "insufficient to constitute opposition to an unlawful employment practice" or to "invoke the protections of" Title VII.  Id. ; see also Greene v. Daimler Chrysler, No. 03-1058 SECTION "T"(5), 2004 U.S. Dist. LEXIS 16620, at *10 (E.D. La. Aug. 18, 2004) (finding that plaintiff's E-mail containing "vague complaints of unfair treatment" and stating, "I believe that values and equality are the backbones of any corporation culture . . . Equality is color blind" did not rise to the level of protected activity).  Without more, a manager's decision to reclassify an employee the manager believes is underpaid is not prohibited discrimination and cannot reasonably be viewed as such.

### b.     **Modarski's Transfer to the Fire Department**

Plaintiff argues that he also engaged in protected activity when he objected to Thomas Modarski's transfer to the Fire Department without paramedic certification at the same pay rate as his coworkers in the Fire Department who did have such certification.  Plaintiff described his objection:

> I tried to question [Diedrich] on her logic on that, and she told me that this gentleman had worked for the City and he knew the geography of the area.  And [I said], "Well, Fran, that doesn't have anything to do with it." . . . .
>
> I wasn't objecting to the transfer itself.  I was objecting to the fact that the employee was being paid at, above employees that had certifications, and it was unequal treatment to them that were working in the program.
>
> . . . .

[At a staff meeting,] I again tried to appeal to Fran's logic on this in
that it would be the same thing if transferring any employee, the
employee would have to qualify for the job first. . . .

. . . .

This was just an established procedure that was violated by Fran.

(Newsom Dep. at 200-203).

Plaintiff's objection to the Modarski transfer was not protected activity.
First, in order for an informal complaint to constitute opposition, it must at least
mention discrimination.  See Moore-Williamson v. Mercer Univ., No. 5:05-cv-140
(CAR), 2007 U.S. Dist. LEXIS 15997, at *15 (M.D. Ga. Mar. 7, 2007) ("For an
informal complaint, such as the one voiced by Williamson, to constitute protected
expression, there must be some mention of discrimination." (citations omitted));
Smith v. Wynfield Dev. Co., 451 F. Supp. 2d 1327, 1348 (N.D. Ga.)("[T]he Court
finds that Plaintiff did not engage in statutorily protected activity because her
testimony reveals that she did not actually complain about age discrimination."),
adopted by 451 F. Supp. 2d at 1329 (N.D. Ga. 2006).  Plaintiff acknowledges, and
his description of his conversation with Diedrich shows, that he did not complain
to anyone that anything to do with Modarski's transfer was based on
*discrimination.*  (See Newsom Dep. at 143).  Thus Plaintiff did not engage in
protected opposition when he objected to Modarski's transfer and the attendant
pay rate.  See Miller v. Am. Fam. Mut. Ins. Co., 203 F. 3d 997, 1008 (7th Cir.
2000) (upholding district court's holding that plaintiff did not engage in protected
expression when "[s]he said nothing to indicate that pregnancy discrimination was

an issue" and her complaints about "matters *other* than her pregnancies" including "a *general* displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them. . . . implied that pregnancy was not a factor in [defendant's] decisions" (emphasis in original)).

Second, even if Plaintiff's statements to Diedrich could be found to constitute opposition to discrimination, the undersigned finds that Plaintiff did not have an objectively reasonable belief that he was opposing an employment practice made unlawful by Title VII. As was the case with his objection to the reclassification of Williams and Hammock, Plaintiff has not identified any action that could reasonably be viewed as constituting an unlawful employment practice under Title VII, or any individual who was or would be discriminated against or adversely affected by it on a basis protected by Title VII. Plaintiff acknowledges that his objection was that Modarski was not qualified for the salary level into which he transferred. But even if this alleged violation of "an established procedure" was not fair to the fire fighters who had paramedic certification, Plaintiff has not shown that it discriminated against or adversely affected any other individual on the basis of race, sex or any other category protected by Title VII. Plaintiff's objection to the transfer and pay level because it was "unfair" or incorrect was not protected opposition. See Birdyshaw v. Dillard's Inc., 308 F. App'x 431, 436 (11th Cir. 2009) (unpublished decision) (holding that plaintiff's letter to Dillard's management describing altercation with her supervisor did not constitute statutorily protected activity and noting that "[s]ignificantly . . .

28

nowhere in the letter did [plaintiff] accuse [the supervisor] of discriminating against her on account of a protected ground") (citing <u>Coutu v. Martin County Bd. of County Comm'rs</u>, 47 F.3d 1068, 1074 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII.")); <u>see also</u> <u>Chevola v. Cellco P'ship</u>, No. 8:06-cv-1312-T-30MAP, 2008 U.S. Dist. LEXIS 7592, at *42 (M.D. Fla. Feb. 1, 2008) ("While the record reflects Plaintiff lodged numerous complaints, there is no evidence that she ever complained to Defendant that her allegations of discrimination, unfair treatment, and/or favoritism were based on age, sex, disability, or any other unlawful basis.  O'Donoghue exhibited this 'unfair treatment' as to both men and wom[e]n, young and old.  Absent some allegation that the mistreatment for which she complained was based on her age, sex, disability, or other unlawful basis, Plaintiff cannot establish she engaged in a statutorily protected activity."); <u>Simmons v. Cox</u>, 495 F. Supp. 2d 57, 66 (D.D.C. 2007) (finding that plaintiff did not engage in protected activity by "informing [her supervisor] that he discriminated against African-American women with college degrees" because "Title VII . . . does not protect employment actions based on education").

### c.   **Promotion of Fritz**

Plaintiff also contends that his objection to the promotion of Donna Fritz to the position of Inspector, Code Enforcement was protected opposition.  According to Plaintiff, his "objections to that promotion was [Diedrich's] intention to promote

a female employee that did not have the qualifications as specified in the job description." (Newsom Dep. at 219).   When asked how he explained to Diedrich his belief that the promotion was discriminatory, Plaintiff responded in the following exchange:

A.   [W]hen [Diedrich] told me that this would disallow a female employee, I explained to her that our job specifications are not gender specific in any way and is not discriminatory.

Q.   So by saying these job standards are not discriminatory, in your opinion, that was objecting to the discrimination in the workplace?

A.   Yes.

Q.   Okay.   Is there anything else you did that you believe articulated to . . . Diedrich or to anyone else that you believed that Donna Fritz's promotion was based on discriminatory animus?

A.   Not during that particular meeting because when I walked out of there I felt she was going to take action against me for objecting to it, and she did.

Q.   Who do you believe you told besides . . . Diedrich that the promotion of Donna Fritz was based on discrimination?

A.   As I said to Fran Diedrich, there was no one else.

Q.   That you said discrimination is going on here with regard to Donna Fritz's promotion?

A.   Correct.

(Id. at 224-25).

The undersigned finds that these statements do not rise to the level of protected opposition and Plaintiff could not reasonably believe that they did because they only evidence Plaintiff's disagreement with Diedrich's decision, not that he was complaining about a practice made unlawful by Title VII.  See Booker,

879 F.2d at 1313. Additionally, as with his objections to Diedrich's other actions discussed *supra*, Plaintiff has failed to identify any individual who, as a member of a protected class, was discriminated against or adversely affected by Fritz's promotion. Instead, the point of his objection, as he testified, was that Fritz was not qualified for the position. Plaintiff speculates that Fritz was promoted because she is a woman and because Diedrich had an agenda to promote women, but he has not identified any unlawful *discrimination* to which he was objecting. It is undisputed that of the applicants for the position, Donna Fritz came closest to meeting all the requirements. Selection of the most qualified applicant is not evidence of discrimination.

### d.   Other Alleged Protected Activity

In his brief and during his deposition, Plaintiff identified several additional objections he made that he alleges constitute protected activity. First, Plaintiff testified that he questioned Diedrich about what she meant by "the job standards being discriminatory against women and minorities" and "showed her the Oliver System Rating Methodology and where we had placed . . . positions, and the five or six components of each job had its own rating and its own score on the Oliver System." (Newsom Dep. at 163). He testified that he told Diedrich that "these job components are not directed towards any group, any gender, or any race; that they are driven by internal equity and market considerations, and there's nothing that [he had] ever done at the City of Marietta that was discriminatory or intentionally discriminatory." (Id. at 163-64).

31

These statements demonstrate nothing more than Plaintiff's disagreement with Diedrich's assessment of the current job standards, which Plaintiff had helped to create.  They do not show, nor does Plaintiff point to, any unlawful employment practice to which he was objecting.  Therefore, Plaintiff's questioning of Diedrich about her assessment of the job standards and his defense of those standards as non-discriminatory do not constitute protected activity.

Plaintiff also objected to Diedrich's alleged decision to "put a stop to classifications" by telling her that doing so would be "in violation of equal pay." (Newsom Dep. at 173-74).  When Diedrich brought up implementation of a "step program," Plaintiff testified that he "explained to her that this would be uneven pay, not based on performance, experience, or anything, and it would be discriminatory . . . ." (Id. at 225).  Plaintiff was asked, "You used those words, 'Fran, this will be discriminatory'?" and he replied, "Uh-huh." (Id.).  More specifically, he testified that he told Diedrich that "it would be against equal pay . . . and you're penalizing this employee for previous awards that employee had made through merit pay," that "[i]t was discriminatory with regard to equal pay for equal work" and that it "would be against the Equal Pay Act." (Id. at 180, 226).

Even if Plaintiff's use of the word "discrimination" and his explicit reference to the Equal Pay Act satisfy the requirement that protected opposition at least mention "discrimination," the undersigned finds that these objections do not constitute protected activity because there is no reasonable basis for Plaintiff's belief that he was opposing a practice made unlawful by Title VII.  Plaintiff's own

statements about why he opposed the proposed step program show that he thought it was unfair because it was not merit based, not that he thought it would discriminate against employees on the basis of race, gender, religion or national origin.

When asked, "[D]id you ever say, 'Fran, you're discriminating against males'?" Plaintiff responded, "Yes, in that I told her that these standards [i.e., the existing employee compensation and classification system] do not specifically prefer any gender, and how can they? . . . They're the same." (Id. at 189). Plaintiff testified that he also told her, "[I]f we need to recruit women and minorities in areas that are predominantly male, we need to specifically advertise and target those specific areas."  (Id.).  Once again, Plaintiff has shown that he disagreed with Diedrich's approach to making hiring, promotion and classification decisions, but unless his expressed disagreement is based on a reasonable good faith belief that those decisions were in violation of Title VII, it does not constitute protected activity.  Plaintiff has failed to point to evidence of such a reasonable good faith belief.[12]

The undersigned concludes that the references to gender and race that were included in Plaintiff's objections to Diedrich's decisions and assessments were

---

[12] Plaintiff testified that he believes that Diedrich had a problem with male employees. (Newsom Dep. at 186) and made reference to Diedrich's use of "gender specific terms," including: calling the water and sewer, electrical and sanitation supervisors "baby-sitters"and using the phrase "good old boy network," among other things (id. at 165-66).  Plaintiff has not linked Diedrich's use of these terms to an unlawful employment practice that he opposed, however, and the undersigned therefore does not address whether Plaintiff's alleged "objections" to Diedrich's use of them constitute protected activity.

insufficient to constitute opposition to unlawful discrimination.  They do not reflect a "reasonable good faith belief that discrimination existed."  Holifield, 115 F.3d at 1566.  At best, they amounted to vague charges of discrimination, and that is not enough to invoke the protections of Title VII's anti-retaliation provision. In Booker, the Sixth Circuit explained why:

> An employee may not invoke the protections of [an anti-retaliation statute] by making a vague charge of discrimination.  Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination.  In our view, such would constitute an intolerable intrusion into the workplace.

879 F.2d at 1313.

## VI. **Conclusion**

The heart of all Plaintiff's complaints was that he simply disagreed with his supervisor's decisions and assessment of the City's policies and procedures, including the employee classification and compensation system.  See Booker, 879 F.2d at 1313-14.  For the reasons discussed *supra*, the undersigned finds that Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to whether he engaged in statutorily protected activity.  Thus he cannot make out a *prima facie* case of retaliatory termination.  In light of this finding, the other elements of Plaintiff's *prima facie* case and Defendant's articulated legitimate, non-discriminatory reason for terminating Plaintiff and other arguments need not be discussed.

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment [Doc. 37] be **GRANTED** and that Plaintiff's claims against Defendant be dismissed.

The Clerk of the Court is **DIRECTED** to terminate referral of this action to the undersigned magistrate judge.

**IT IS SO REPORTED AND RECOMMENDED** this 5th day of January, 2010.

*Susan S. Cole*
SUSAN S. COLE
United States Magistrate Judge